Calvin WEST, Plaintiff,

v.

Jo Anne B. BARNHART, Commissioner of Social Security, Defendant.

No. 02–21774–CIV.

United States District Court, S.D. Florida, Miami Division.

Sept. 4, 2003.

Lizel Vionet Gonzalez, Legal Services of Greater Miami, Troy Edward Elder, Catholic Charities Legal Services, Miami, FL, Leslie Noelle Powell, Legal Services of Florida Keys, Key West, FL, for Plaintiff.

Lisa Hu Barquist, United States Attorney's Office, Miami, FL, for Defendant.

ORDER ON MOTIONS FOR SUMMARY JUDGMENT

JORDAN, District Judge.

Without objection, Magistrate Judge Brown's report [D.E. 32] is ADOPTED IN FULL. Jo Anne Barnhart's motion for summary judgment [D.E. 26] is DENIED. Calvin West's motion for summary judgment [D.E. 27] is GRANTED. This case is REMANDED to the Commissioner for further proceedings consistent with the report and recommendation.

All pending motions are DENIED AS MOOT, and this case is CLOSED.

### REPORT AND RECOMMENDATION

Brown, United States Magistrate Judge.

**This cause** is before the Court on the Plaintiff's Motion for Summary Judgment, filed April 10, 2003 and on Defendant's Motion for Summary Judgment, filed April 8, 2003. The Court has reviewed the Motions and the Response to Plaintiff's Motion, and all pertinent portions of the file.

### *Procedural History*

In a prior decision, Plaintiff was determined to be disabled as of May 1, 1991, due to complications associated with cancer of the mouth and throat. (T. 16,236, 247). The State Agency determined that this disability ceased as of February 1, 1999, due to medical improvement, which allowed Plaintiff to perform light exertional work. (T. 16, 231–53). Plaintiff appealed that determination on February 9, 1999. (T. 81–82). An administrative hearing was held on November 9, 2000, and in a decision dated November 22, 2000, the ALJ issued a decision affirming the Agency's decision. (T. 16)

On January 23, 2001, Plaintiff requested review by the Appeals Council, which denied review on April 11, 2002. (T. 4–5, 10–12). Thus, the decision of the ALJ remains the final decision of the Commissioner.

Plaintiff filed the complaint in the instant case on June 13, 2002. After the case was remanded to locate certain missing exhibits, on February 12, 2003, the case was reopened and on February 19, 2003, Defendant filed an answer to the complaint.

### *Facts*

#### I.  *Plaintiff's Testimony*

Plaintiff testified that he was 49 years old at the time of the hearing, however his birth date of March 22, 1952, made him 48

years old. (T. 44). The record indicates that prior to being diagnosed with cancer, he worked as a construction worker. (T. 17, 249). Plaintiff has an eleventh grade education and is able to speak, read and write English. (T. 17, 249). At the hearing, Plaintiff argued that his condition meets the requirements of Listing 13.02, or alternatively, that his combination of impairments, including hepatitis, vision and prostate problems, cause him to equal a listed impairment. (T. 44).

Plaintiff testified that he lived with his parents and couldn't really remember the last time that he worked. (T. 45). Plaintiff stated that he was not working because he doesn't "have any chest muscle" and that his tongue and throat are "worse than it was." (T. 45). Plaintiff explained that they cut his chest and that the pain runs from his chin down to his chest. (T. 64). Plaintiff described the pain as "sharp, intense" and that lasts until he takes Tylenol, Advil or Ibuprofen. (T. 46). He does not take any prescription pain medication because of his hepatitis. (T. 52). Plaintiff also stated that his eye were "going bad" and that he couldn't eat or swallow. (T. 46). He stated that he eats by putting vegetables in the blender or makes something soft like eggs or oatmeal. (T. 46).

Plaintiff stated that since 1997 or 1998 he was being treated by Dr. Chin once a month for hepatitis, and was taking synthroid for his thyroid condition. (T. 47). He also was being seen by a doctor for the cancer. (T. 47). Prior to his radiation treatment, he weighed 150 pounds, but has only weighed between 117 and 120 pounds since the treatment. (T. 48).

Plaintiff stated that his condition has stayed the same since February of 1999. (T. 48). He said that he has good days and bad days where he doesn't feel like getting up. (T. 49). On an average weekday, he doesn't do anything but try to hang around the house and keep it clean, and then on the weekends he "drink[s] a little beer." (T. 49).

Plaintiff stated that he can't lie flat, and how long he can stand depends on how hot it is outside because he gets dizzy. (T. 49). He could not say how often he gets dizzy but it is not on a daily basis. (T. 49). He sometimes passes out, the last time being a couple of weeks prior to the hearing. (T. 50). That was the first time in 2000, and the time prior to that was in 1998. (T. 50–51). He has not been hospitalized on an emergency basis in the past 2 years. (T. 52).

Plaintiff stated that the last job he had was in a store, stocking shelves and cutting lunch meat but he could not do that job any more because he can't stand that long and can't bend up and down because he gets dizzy. (T. 52). The heaviest weight he can currently lift is a gallon of milk on one side, but not the other. (T. 53). He is able to raise his hands over his head. (T. 53). His last job did not require him to walk because he was mostly behind the meat counter. (T. 53). He doesn't climb stairs because it makes him tired. (T. 54). Plaintiff states that he gets forgetful. (T. 53).

On a normal day, if Plaintiff feels like getting up, he does, and might cook a little breakfast, then he sits back down and watches television for the rest of the day. (T. 54). At the current time, Plaintiff lives alone in his parents' house. (T. 54). Plaintiff stated that even though his parents don't live with him, they take care of him, such as going to the grocery store and doing everything that needs to be done. (T. 54). He said that he just sits around the house and tries to cook something to eat. (T. 55). He does not do laundry or go to the grocery store, and he does very little cleaning. (T. 55). If he cleans, he can mop one floor but then he is tired. (T. 58). He does take the garbage

out but does not do any outside work. (T. 55). When he goes to the doctor's office, someone comes and picks him up and drops him off. (T. 56). He also sometimes goes to church. (T. 56). He does not go anywhere with friends because he is embarrassed because people can "outtalk" him, but every now and then someone comes by. (T. 57). When he drinks beer on the weekend, he drinks it by himself. (T. 57).

He stated that he does not have a drivers license because his doctor told him it wouldn't be a good idea in case he passes out behind the wheel. (T. 58). When he is not watching television, he sleeps off and on. (T. 58). He takes a nap every day. (T. 59). Plaintiff stated that he has missed family reunions and funerals because of his condition. (T. 59). In 2000, he missed the funerals of his cousin and his girlfriend. (T. 60).

Plaintiff stated that his doctor has also talked to him about his prostate but that he hasn't done anything about it because he "[doesn't] want to get cut no more." (T. 61). He stated that his primary medical problem in the past two years has been "pain and frustration." (T. 61). On a good day, his energy level is about a 3 ½ or 4 out of 10, and on a bad day he doesn't feel like doing anything. (T. 62). He has more bad days than good ones. (T. 62). Some mornings he takes two advils or tylenols before he eats to keep his mouth from hurting while he's sitting around. (T. 63)

## II. *Medical Evidence Submitted to ALJ*

On May 4, 1992, Plaintiff underwent corrective surgery after being diagnosed with squamous cell carcinoma of the floor of the mouth. (T. 111). The Plaintiff's chest muscle was removed and used for restorative purposes in the cancerous area. (T. 111, 160, 229). On June, 6, 1992, Plaintiff was readmitted into the hospital due to an infection in the wound. (T. 115). In December of 1992, Plaintiff complained of bleeding from his mouth. (T. 121). On January, 12, 1993, a biopsy indicated focal ananthothic hyperplasia of squamous mucosa with severe underlying inflammation. (T. 117). By March 4, 1997, Plaintiff underwent between 6–7 surgeries to remedy the cancer. (T. 158). After the surgeries, Plaintiff complained of discomfort when eating, general pain and fatigue. (T. 81, 114, 116, 145, 146, 151, 155, 164, 237).

When treating physician Dr. James Chen saw Plaintiff in July of 1998, the doctor concluded that Plaintiff had no complications and took no medicine. (T. 149). On July, 14, 1998 Plaintiff was diagnosed with chronic liver disease associated with hepatitis C due to alcohol abuse. (T. 96). In August of 1999, Plaintiff had no new complaints, and Dr. Chen noted that Plaintiff was noncompliant despite repeated advice to the contrary. (T. 140).

On January 3, 2000, Dr. Lita Calagua saw Plaintiff, due to his complaints of left arm pain and numbness. (T. 220). The examination revealed that Plaintiff did not have difficulty swallowing, and that congitive evaluation was normal. (T. 220, 221). Further Dr. Calagua noted that the EMG revealed no abnormal spontaneous activity, but evidence of chronic denervation in the ulnar innervated muscle. (T. 209). On January 20, 2000, Plaintiff was diagnosed with hyperthyroidism. (T. 135–137). On January 27, 2000, Plaintiff suffered from an osteophyte in the inferior posterior spine, which causes spinal stenosis. (T. 213). No further medical evidence was submitted.

## III. *Medical Expert Testimony*

Dr. Joseph Rubini, certified specialist in oncology and internal medicine, testified after asking Plaintiff several questions

about his habits. Plaintiff advised Dr. Rubini that he smokes a pack of cigarettes every week and a half, and admitted that he had been advised to stop smoking. (T. 66). Plaintiff also stated that he drinks a six-pack on the weekend. (T. 66).

Dr. Rubini testified that there has been no recurrence of the cancer, but because of the multiple mutilating surgeries, the net result was a residual problem with some pain in his mouth, difficulty swallowing, and some throat pain, as well as some anterior chest wall pain because of the removal of muscles. (T. 67). Dr. Rubini concurred that there were objective findings which would support Plaintiff's complaints of pain, but also noted that the pain was relieved with Tylenol so that he was able to eat. (T. 67). Dr. Rubini stated that knew that Plaintiff wasn't free of pain or discomfort after he eats, but that it was "apparently tolerable in some aspects anyway." (T. 68). Dr. Rubini stated that there was a possibility of recurrence of the cancer as long as Plaintiff continued to smoke and drink alcohol, and that if it were to recur, it would most likely be within a few years. (T. 70).

Dr. Rubini further testified:

Q: (By the ALJ) He also complains of fatigue. Is that sometime [sic] that would normally present at the present time?

A: Not—I don't think as a result of cancer. Not as a result of the surgeries.

Q: What about the other conditions?

A: Fatigue component might be attributable to his hepatitis, it might be attributable to depression, and—at least those are two–

Q: He's not being treated for any psychological condition, is he?

A: Not that I know of.

\* \* \* \* \* \*

Q: Ordinarily you would expect or you would not expect that to, hepatitis to be of such to, fatigue to be so severe as to prevent work?

A: The degree of Plaintiff's liver cell dysfunction that I see doesn't correlate with the amount of fatigue and discouragement that he shows so that I really don't think that hepatitis C is playing a strong roll. It could be a contributory factor but the cause [sic]. But obviously, mathematically we arrive at depression as being the significant factor here.

Q. But we don't have any evidence in the file of treatment for that condition.

A. That is correct.

Q: (By ALJ): By you coming up with that statement, does that indicate to me that physical findings are not that impressive with regard to one having fatigue so bad that they couldn't tolerate sedentary or light work?

A: I find no finding that would preclude light or sedentary work.

(T. 69). Upon questioning by Plaintiff's counsel, the ALJ stated:

Q: And addressing his statements of tiredness, assuming that they're determined to be credible, how would that affect his ability to do sedentary and light work?

A: It would affect it. It depends on the degree of fatigue that he felt and the degree of the desire to carry out the task. But on the physical basis I don't know why he couldn't do light work.

Q: Do you suggest that a possible reason for some of the symptoms that he's describing might be attributable to depression, is that—?

A: That's right.

\* \* \* \* \* \*

Q: And regarding the depression, it is your opinion that evaluation of his depression and mental functioning would be helpful to determine if he has a mental impairment?

A. Yes.

T. 68–72.

### IV. *ALJ's Decision*

The ALJ found that Plaintiff suffered from the severe impairments of hypothyroidism, hepatitis C and residuals of surgery for a carcinoma of the mouth, but that these impairments did not meet or equal the severity of any listed impairment, giving specific consideration to the requirements of 20 C.F.R. 404.1521. (T. 22). After considering certain non-medical factors in accordance with 20 C.F.R. § 404.1529(c)(3) and SSR 96–7p, the ALJ found that Plaintiff testified as to certain subjective complaints. (T. 21). However, Plaintiff had not mentioned these complaints when seeking treatment in recent years. (T. 21) Furthermore, the ALJ found that Plaintiffs' reported activities were consistent with the demands of a "residual functional capacity to at least perform the full range of light work." (T. 23).

The ALJ noted that although claimant had reported some limitation in sitting for long periods due to leg pain and a prostate condition, his leg pain was relieved by Ibuprofen and was reported to his physician as affecting only his ability to walk. (T. 15). The ALJ additionally found that the prostate condition was "mostly resolved" by medication by May of 2000. (T. 15).

The ALJ also noted that Plaintiff required very little medical treatment during the period under adjudication, noting no doctors visits during the period of December 1997 through December 1999, no surgery needed, and no doctor had recommended an assistive ambulatory device or placed any functional limitations which would preclude at least a sedentary exertional level. (T. 15). The ALJ found that "[a]lthough the claimant may sincerely believe that substantial limitations exist," the claimant was not credible to the extent of establishing total disability. (T. 15). Therefore, the ALJ found that Plaintiff retained the residual functioning capacity to perform all or substantially all occupations existing at the sedentary exertion level, which would involve lifting no more than 10 pounds, sitting for long periods, walking and standing up to 2 hours in an 8–hour day, and repetitive hand-finger actions. (T. 15). The ALJ supported this assessment by the state agency findings that the claimant can perform a substantial range of "medium" work. (T. 15).

Classifying Plaintiff as a person "closely approaching advanced age with more than a high school education and a skilled work history," and after considering the testimony of the vocational expert as to the jobs that the hypothetical claimant in the question posed by the ALJ could perform, the ALJ applied the Medical–Vocational Guidelines ("the Grids"), which directed a finding of not disabled. (T. 16).

### *Discussion*

#### I. *Scope of Review*

██ The scope of judicial review of factual findings in a disability case is limited to a determination of whether the findings are supported by substantial evidence. 42 U.S.C. § 405(g); *Brown v. Sullivan*, 921 F.2d 1233 (11th Cir.1991); *Martin v. Sullivan*, 894 F.2d 1520 (11th Cir.1990). Substantial evidence is more than a mere scintilla; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir.1997) (quoting *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). Even if this Court finds that the preponderance of the evidence weighs against the Commissioner's decision, an affirmance is required if the decision is supported by substantial evidence. *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir.1991). In

determining the existence of substantial evidence, this Court must scrutinize the entire record, taking into account evidence both favorable and unfavorable to the Secretary's decision. *Bridges v. Bowen,* 815 F.2d 622, 624 (11th Cir.1987).

■ The Commissioner's failure to apply the correct legal standards or to provide the reviewing Court with a sufficient basis for a determination that proper legal principles have been followed mandates reversal. *Foote v. Chater,* 67 F.3d 1553, 1558 (11th Cir.1995); *Barnes v. Sullivan,* 932 F.2d 1356 (11th Cir.1991); *Martin v. Sullivan,* 894 F.2d 1520, 1529 (11th Cir. 1990).

## II. Analysis of Disability

Regulations promulgated by the Commissioner establish a five-step analysis to determine disability. 20 C.F.R. § 416.920(a)—(f). If the claimant is presently employed, a finding of non-disability is made, and the inquiry ends. 20 C.F.R. § 404.1520(b). At step two, a determination must be made deciding whether the claimant suffers from a severe impairment or combination of impairments; if not, then non-disability is found. 20 C.F.R. § 404.1520(c). If step three is reached, a comparison is made between the claimant's impairments and those listed in 20 C.F.R. § 404, Subpart P, Appendix 1. If the impairment meets or equals those within the listing, disability is presumed and benefits are awarded. 20 C.F.R. § 404.1520(d). The fourth step involves a determination as to whether the impairments prevent the claimant from performing past relevant work. The claimant has the initial burden of showing the inability to perform previous work. *Doughty v. Apfel,* 245 F.3d 1274, 1278 (11th Cir.2001); *Lucas v. Sullivan,* 918 F.2d 1567, 1571 (11th Cir.1990). Once this showing is made, the burden shifts to the Commissioner to prove the existence in the national economy of other types of substantial gainful employment that the claimant can perform. *Allen v. Bowen,* 816 F.2d 600, 601 (11th Cir.1987); 20 C.F.R. § 404.1520(e), (f).

## III. Is the ALJ's decision supported by substantial evidence?

The Plaintiff's principal claims are that: (1) the Commissioner erred by not requesting a consultative examination to find for depression in order to fully and fairly develop the record; (2) the Commissioner erred by failing to consider Plaintiff's subjective symptoms; and (3) the commissioner erred by failing to comply with the appropriate standard for evaluating non-extertional limitations.

### A. Consultative Examination

In finding that a psychological consultation was not necessary, the ALJ stated:

> [T]he record is devoid of any evidence of an emotional impairment. The claimant has never specifically complained of depression (even at the hearing) and none of the examining physicians have remarked on any overt mental status abnormalities. I find that, Dr. Rubini's speculation that the alleged fatigue might be due to depression, as there was a lack of conditions which would cause severe fatigue, is insufficient to require ordering of any further evaluation. Speculation could also, indicate oxygenation, deconditioning, residuals from drinking or failure to take his synthroid as causes for fatigue.

T. 19.

■ It is the duty of the ALJ to fully and fairly develop the record. *Graham v. Apfel,* 129 F.3d 1420, 1422–23 (11th Cir. 1997). This duty may include a consultative examination in order for the ALJ to make an informed decision. *Holladay v. Bowen,* 848 F.2d 1206,1209 (11th Cir.1988). A consultative examination is only required, however, when information is not

in the record. *See Doughty v. Apfel,* 245 F.3d 1274, 1281 (11th Cir.2001).

▮ The Court finds that the ALJ erred in not ordering a psychological consultative examination in this case. Although the ALJ's finding that Plaintiff has never specifically complained of "depression" may be true, Plaintiff did, as the ALJ acknowledged, complain of fatigue. Dr. Rubini testified that these complaints of fatigue were probably not due to Plaintiff's physical impairments, and that "mathematically we arrive at depression as being the significant factor here." Dr. Rubini further found that evaluation of Plaintiff's depression and mental functioning would be helpful to determine whether Plaintiff has a mental impairment. (T. 72). Moreover, as Plaintiff notes, the ALJ's finding that "the record is devoid of any evidence of an emotional impairment" is contradicted by references in the record to symptoms associated with depression, including complaints of mood swings, insomnia, fatigue, lack of interest in activities, frustration and forgetfulness. (T. 53, 54, 57, 127, 160, 241, 243). The Court agrees with the ALJ that neither the Commissioner nor the Court should speculate as to the possible cause of the fatigue, which is undoubtedly a symptom of depression.[1] Although emphasizing that a psychological consultation is not required in every case in which the claimant complains of fatigue, this Court finds, in light of the testimony by Dr. Rubino, that a psychological consultation should have been ordered.[2]

## B. *Subjective Symptoms*

▮ Plaintiff's next claim is that the ALJ did not consider the Plaintiff's subjective symptoms, specifically his complaints of pain. The Eleventh Circuit has established a three part standard which applies when a claimant attempts to establish disability through his or her own testimony of pain or other subjective symptoms. This standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain. *Foote v. Chater,* 67 F.3d 1553, 1560–61 (11th Cir.1995) (citing *Holt v. Sullivan,* 921 F.2d 1221, 1223 (11th Cir.1991)). A claimant's subjective testimony supported by medical evidence that satisfies the pain standard is itself sufficient to support a finding of disability. *Id.* at 1561. If a claimant establishes disabling pain through objective medical evidence that an underlying medical condition exists that could reasonably by expected to produce the pain, all evidence about the intensity, persistence, and functionally limiting effects of pain or other symptoms must be considered in addition to the medical signs and laboratory findings in deciding the issue of disability. *Id.* at 1560.

▮ An ALJ may decide not to credit a claimant's testimony as to pain. However, he must "articulate explicit and adequate reasons for doing so." *Foote,* 67 F.3d at 1561–62; *see also Marbury v. Sullivan,* 957 F.2d 837, 839 (11th Cir.1992). This Court finds that the ALJ considered Plaintiff's subjective symptoms and properly rejected them as not credible. The

---

1. The ALJ himself recognized in his Report that "[f]atigue might be due to depression." T. 19.

2. Although Dr. Rubini did testify that even considering Plaintiff's complaints of fatigue,

Plaintiff was not physically precluded from performing light or sedentary work, if the fatigue is indeed due to depression, such a mental impairment could include other symptomology which may arguably preclude or limit Plaintiff's ability to work.

ALJ supported his finding that Plaintiff's testimony that he suffers from disabling pain was not fully supported or credible, by noting that Plaintiff takes no prescription pain medications and that his pain responds to use of Tylenol, Advil or Ibuprofen (T. 21). The ALJ further noted that Plaintiff has "offered few significant complaints to Dr. Chen on most visits in recent years although he continues to drink against medical advice and despite his repeated noncompliance with medication (especially the Synthroid)." *Id.* The ALJ also noted that Plaintiff has not been hospitalized or required emergency room treatment for pain or other symptoms in the past medical years. *Id.* Finally, the ALJ found that "there are no independent, convincing indications of significant limitations in daily activities." *Id.* The Court therefore finds that the ALJ properly considered Plaintiff's subjective complaints of pain, but rejected them as not credible to the degree alleged.[3]

### Recommendation

Based on the foregoing, the undersigned respectfully recommends as follows:

1. That Defendant's Motion for Summary Judgment be **DENIED**,

2. That Plaintiff's Motion for Summary Judgment be **GRANTED**, and that the case be remanded to the Commissioner for further proceedings consistent with this Report and Recommendation.

The parties have ten (10) days from the date of this Report and Recommendation within which to serve and file written objections, if any, with the Honorable Adalberto Jordan, United States District Judge for the Southern District of Florida. Failure to file objections timely shall bar the

3. Plaintiff additionally argues that his non-extertional impairments of limitation of pain, depression and dizziness prevented the ALJ from properly relying on the medical-vocational guidelines ("Grids"). Because this

parties from attacking on appeal the factual findings contained herein. *LoConte v. Dugger,* 847 F.2d 745 (11th Cir.1988), *cert. denied,* 488 U.S. 958, 109 S.Ct. 397, 102 L.Ed.2d 386 (1988).

Dated Aug. 13, 2003.

Court finds that the case should be remanded for further findings on the issue of depression, the appropriateness of reliance on the Grids will also need to be reevaluated on remand.